**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THE HERSHEY COMPANY, | : | 1:12-cv-1769 |
| | : | |
| Plaintiff, | : | Hon. John E. Jones III |
| | : | |
| v. | : | |
| | : | |
| BAKERY, CONFECTIONERY, | : | |
| TOBACCO WORKERS & GRAIN | : | |
| MILLERS INTERNATIONAL UNION, | : | |
| LOCAL 464, AFL-CIO, | : | |
| | : | |
| Defendant. | : | |

## <u>MEMORANDUM</u>

## October 17, 2013

Through the underlying action, Plaintiff seeks *vacatur* of an arbitration

award issued in favor of Defendant (Count I of the Second Amended Complaint)

and a declaratory judgment that various grievances filed by Defendant are not

arbitrable (Count II of the Second Amended Complaint). Presently, three motions

remain pending before the Court in this matter: Defendant's Motion for Judgment

on the Pleadings (Doc. 36), Plaintiff's Motion for Judgment on the Pleadings on

Count I of the Second Amended Complaint (Doc. 40), and Plaintiff's Motion for

Summary Judgment on Count II of the Second Amended Complaint (Doc. 42).

For the reasons that follow, we will grant Defendant's motion for Judgment on the

Pleadings in full, and deny Plaintiff's motions.

## I.    BACKGROUND[1]

The Hershey Company ("Hershey" or the "Company") and the Bakery, Confectionery, Tobacco Workers & Grain Millers International Union, Local 464, AFL-CIO (the "Union") are parties to a collective bargaining agreement ("CBA") executed in 2005.  (Doc. 18-1, Ex. A).  Relevantly, the CBA includes a grievance procedure, directing that "[i]f any dispute shall arise between the Employer and the Union, or its members, there shall be no suspension of work or slowdown on account of such difference or dispute, but such dispute shall be treated as a grievance and settled in accordance with the [outlined] procedure. . . ."  (*Id.* ¶ 7(a)).

In light of the Company's decision to close its manufacturing facility at 19 East Chocolate Avenue, Hershey, and transfer certain operations to its West Hershey plant, both locations being within the Union's jurisdiction, the parties also executed a Memorandum of Agreement ("MOA") dated May 28, 2010.  (Doc. 18-1, Ex. B).  The parties agreed that the MOA and its attachments would "amend, modify, and in some cases supersede the CBA," (*id.* ¶ 1), and "constitute[] the complete understanding between the Parties."  (*Id.* ¶ 6(d)).  The parties further agreed that the MOA would "be enforced pursuant to the grievance and arbitration

_____

[1] For purposes of this Section, in light of the standard of review applicable to motions for judgment on the pleadings, the facts are derived from the pleadings and exhibits attached thereto. *See Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 220 (3d Cir. 2005).

procedures of the CBA, as amended by this [Memorandum of] Agreement." (*Id.* ¶ 6(e)).

The MOA incorporated various supplemental agreements, one of which was entitled Benefits Collaboration and included at Attachment I ("Attachment I"). (Doc. 18-1, Ex. B). This attachment provided, in general, that the Company would offer the same benefits plans to its unionized workforce as it does to its salaried employees, noting that any modification of benefits to salaried workers would also apply to those covering current and former hourly employees. (*Id.*). The list of benefits subject to change included "[e]mployee contributions to include tobacco-free differentials." (*Id.*). In addition, the attachment noted various exceptions to the rule that Hershey would implement a uniform medical benefits plan, namely that union members' cost-sharing percentage would not increase more than 2% per year and would not exceed 30% for the duration of the agreement, and that annual out-of-pocket maximums for certain medical plans would be capped. (*Id.*). As to general premium computation, Attachment I provided for a three-year smoothing calculation (Murphy Formula) and specified the methodology for determining the medical trend. (*Id.*). The attachment also instructed that the pre- and post-65 retiree medical contribution percentages and "frozen" contributions applying to existing retirees would remain unchanged, except for the overage amount, and that

active employees who are retiree medical eligible and retire while the agreement remains in effect will pay the same contribution percentage as all salaried pre- and post-65 retirees, plus an overage amount. (*Id.*). Significantly, the final clause of Attachment I directed that "any disputed amendments or changes that fall outside this Benefits Collaboration agreement will be subject to the grievance process set forth in paragraph 7 of [the CBA]." (*Id.*).

Subsequent to the execution of the MOA, in June 2010, Hershey mailed a flyer to its unionized employees notifying them that they must be tobacco-free by October 15, 2010. (Doc. 18, ¶ 19).[2] On August 24, 2010, Hershey held an update meeting to discuss benefits plan changes for 2011 with the Union, at which it presented a document stating that "[t]obacco users will pay [an] additional $25 monthly." (*Id.* ¶¶ 20-21). However, later, between October 18 and 20, 2010, Hershey distributed a 2011 Employee Benefit Guide to union employees, which explained that "employees who are tobacco-free will be rewarded by receiving a discount of $25 per month on medical premiums–that's $300 for the year." (*Id.* ¶ 22). Open enrollment for the 2011 benefits-plan year commenced on October 27, 2010, and the first payroll deductions for those health plans were levied in January

---

[2] Prior to May 2010 and continuing thereafter, Hershey had implemented a program as to its nonunion employees, whereby tobacco users paid a $25 monthly fee in addition to their medical benefit premium, while non-users did not pay a fee. (Doc. 18, ¶¶ 17-18).

2011. (*Id.* ¶¶ 23-24). Beginning in 2011, unionized tobacco users were assessed an additional $25 monthly fee, while non-users were not. (*Id.* ¶¶ 24-25).

On January 21, 2011, the Union filed a grievance protesting the fee, alleging that Hershey had misled union members by representing that tobacco-free employees would be rewarded by receiving a discount of $25 per month. (*Id.* ¶ 28). The parties followed the grievance process as set out in the CBA and convened an arbitration hearing on April 10, 2012. (*Id.* ¶ 29).

An opinion and arbitration award were issued on August 6, 2012, sustaining the grievance. (Doc. 18-3, Ex. F). As a preliminary matter, the arbitrator observed that the grievance disputed "the format of [the tobacco-free differential's] introduction as a promise of reduced cost of healthcare premiums[,]" and did not fundamentally challenge the Company's "contractual right to create and establish a tobacco-free differential." (*Id.* at 9). Referencing the materials disseminated to union members in June and October 2010, the arbitrator reasoned that the Company promoted the differential "as a reward and a discount for tobacco-free employees," but that the monthly charge assessed to tobacco users, over and above base premiums, amounted to a penalty. (*Id.*). In this regard, he noted that the premiums were calculated inclusive of claims filed by all insureds – those who used tobacco and those who did not – concluding that tobacco-free employees, by

paying this rate, were not receiving a reduction as promised. Accordingly, the arbitrator rejected Hershey's argument that tobacco-free employees enjoy a discount by not paying the fee, explaining that "the non-smokers [sic] rate is the normal rate." (*Id.* at 10). The arbitrator additionally noted that Hershey did not dispute that some union members may have given up their right to use tobacco in light of the advertised discount, (*id.* at 8), and also that, by such inducement, the Company would have enjoyed the benefits of a healthier workforce, resulting in reduced claims. (*Id.* at 10).

By way of conclusion, the arbitrator stated that Hershey had violated Attachment I of the MOA by "establishing and implementing a tobacco-free differential not in conformity with or consideration of the manner by which healthcare insurance rates are determined." (*Id.*). The arbitrator ordered that employees who were induced to and did qualify for the reduced premium by October 15, 2010 "shall be reimbursed by cash or credit, pro-rata, the $300.00 rewarded discount" from the standard rate of the benefit plan selected. (*Id.* at 11). Nonetheless, he rejected the claim that tobacco users who paid the fee should be reimbursed, reasoning that such assessment was within the purview of the Company pursuant to the contribution differentials clause of Attachment I. (*Id.* at 10).

The Union thereafter lodged two further grievances pertaining to the assessment of fees to tobacco users: one filed on September 10, 2012 ("2012 Tobacco-Free Grievance") and the other on October 23, 2012 ("2013 Tobacco-Free Grievance"). (Doc. 18, ¶¶ 43, 50). The first protested a $35 per month penalty assessed to tobacco users and introduced in plan year 2012, and the second anticipated the application of a similar fee in plan year 2013. (*Id.* ¶¶ 44, 51). These fees were applicable to both union and nonunion employees. (*Id.* ¶¶ 45, 52). In 2011, Hershey had distributed an employee benefits guide stating that, as to plan year 2012, "[i]f you use tobacco you will pay an additional $35 per month for your medical benefits." (*Id.* ¶ 48). Both grievances averred that the penalty violated the tobacco-free differential of Attachment I and also the August 6, 2012 arbitration award. (*Id.* ¶¶ 44, 51).

In addition, the Union filed three other relevant grievances, which did not pertain to the tobacco-free differential. On October 26, 2011, the Union filed a grievance challenging certain provisions of Hershey's 2012 benefits plans ("2012 Healthcare Grievance"), specifically asserting that the plan violated the CBA by

1.  Increas[ing] . . . employee cost-sharing over and above the limits set forth in the Agreements.
2.  [Utilizing a]rbitrary and capricious trending and other methodology in determining the premiums.

3. Failing to provide plan designs for bargaining unit employees and bargaining unit retirees as required under the Agreements.

4. Violati[ng] . . . terms and conditions applicable to retirees who are eligible for retiree healthcare.

(Doc. 18-4, Ex. J). On October 23, 2012, the Union lodged a grievance in protest of the 2013 benefits plan ("2013 Healthcare Grievance"), which grievance omitted the claim concerning the Company's failure to provide appropriate plan designs for bargaining unit employees and retirees but, otherwise, was similar to the 2012 Healthcare Grievance. (Doc. 18-4, Ex. K).

On February 14, 2012, the Union filed a grievance asserting that Hershey's Wellness Program violated Attachment I "by not including all eligible participants" ("Wellness Program Grievance"). (Doc. 18-4, Ex. L).[3]

Hershey commenced the present action against the Union on September 5, 2012, by filing a Complaint and Petition to Vacate Arbitration Award (Doc. 1).

_____

[3] This grievance was referred to arbitration, and a decision and award were issued on March 14, 2013 in favor of the Union. (Doc. 30-3, Ex. 3). The arbitrator observed that, under Attachment I of the MOA, the Company was required to provide the same benefits to "current and former hourly employees" as it does to salaried employees and found that the term "former hourly employee[]" included retirees under the age of 65 ("pre-65s") based on the bargaining history between Hershey and the Union. (*Id.* at 10). By not providing the same Wellness Program to pre-65s, the arbitrator concluded, Hershey was violating the MOA. (*Id.*).

Notably, the arbitrator clarified that the substantive arbitrability of the grievance was not before him, and accordingly, he declined to address this issue, assuming arbitrability. (*Id.* at 2).

Hershey filed a First Amended Complaint (Doc. 2) on September 12, 2012, and with leave of Court, filed a Second Amended Complaint (Doc. 18) on December 21, 2012. That Complaint sought *vacatur* of the tobacco-free arbitration award (Count I) and declaratory judgment that the 2012 and 2013 tobacco-free grievances and the healthcare and wellness program grievances (the "Attachment I Grievances") were not subject to arbitration (Count II).

Soon thereafter, the Union filed a Motion to Dismiss (Doc. 19), and, after full briefing, this Court held oral argument on the motion. Following argument, we issued an order (Doc. 29), explaining that it would be premature to render a final ruling at the 12(b)(6) stage, denying the Union's Motion to Dismiss as moot, and ordering the Union to file an answer to Hershey's Second Amended Complaint.

The Union filed an Answer (Doc. 30) on May 13, 2013, and, on July 17, 2013, a Motion for Judgment on the Pleadings (Doc. 36), along with a supporting brief (Doc. 37). On July 19, 2013, Hershey filed a Motion for Judgment on the Pleadings on Count I of the Second Amended Complaint (Doc. 40) and a brief in support (Doc. 41), as well as a Motion for Summary Judgment on Count II of the Second Amended Complaint (Doc. 42), accompanied by a brief (Doc. 43) and a Statement of Facts (Doc. 44). At this time, all motions have been fully briefed and are ripe for review.

## II.    STANDARDS OF REVIEW

As to the motions for judgment on the pleadings, Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). The moving party must clearly establish that no material issues of fact exist and that it is entitled to judgment as a matter of law. *See Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008) (quoting *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290 (3d Cir. 1988)). We consider the facts, as presented in the pleadings, and the inferences to be drawn therefrom, in the light most favorable to the nonmovant. *See Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 220 (3d Cir. 2005).

Similarly, summary judgment should be granted if the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a fact is "material" only if it might affect the outcome of the action under the governing law. *See Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 172 (3d Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 248 (1986)). Unlike in the Rule 12(c) context, a court may consider evidence

outside of the pleadings. *See, e.g.*, FED. R. CIV. P. 12(d) (stating that a motion styled under Rule12(c) must be treated as a summary judgment motion if "matters outside the pleadings are presented to and not excluded by the court"). We view the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Montone v. City of Jersey City*, 709 F.3d 181, 189 (3d Cir. 2013); *see also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) ("In considering a motion for summary judgment, a . . . court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" (quoting *Anderson*, 477 U.S. at 255)).

## III. DISCUSSION

In Count I of the Second Amended Complaint, Hershey petitions for *vacatur* of the August 6, 2012 arbitration award on the basis that the arbitrator had exceeded his powers and that the award, rather than drawing its essence from the contract, "reflects the arbitrator's own notions of industrial justice." *Eastern Assoc'd Coal Corp. v. Mine Workers of Am., Dist. 17*, 531 U.S. 57, 62 (2000) (citation and internal quotation marks omitted). In Count II, Hershey seeks declaratory judgment that the grievances lodged with respect to its benefits plan changes and the implementation thereof are substantively nonarbitrable. We

address each of these counts – and the relevant motions – *seriatim*.

### A.    Petition to Vacate Arbitration Award

In support of its Motion for Judgment on the Pleadings, the Union argues that the arbitration award is supported by the terms of the MOA, observing that the arbitrator's opinion referred to the language of Attachment I (*e.g.*, concerning the calculation of premiums and the smoothing formula), the informational materials Hershey provided to the Union and its members, and the parties' bargaining history in interpreting the phrase "tobacco-free differential."

Hershey counters that the award was not based on a determination of the meaning of "tobacco-free differential," explaining that the grievance, and, hence the award, was based on communications outside of Attachment I.  Hershey contends that such communications are irrelevant because there was no evidence than any union member had been induced to cease using tobacco as a result of the disseminated materials; in fact, the Company asserts, the 2011 enrollment packet advertising the discount was distributed starting October 18, 2011, which was after the date employees were required to be tobacco free in order to take advantage of the benefit.  (Doc. 18, ¶ 19) (stating that Hershey mailed union members a circular in June 2010, indicating that they must be tobacco free by October 15, 2010).

In advancing its own motion on the pleadings, Hershey centrally argues that

the arbitration award, requiring the Company to provide a reimbursement to union employees which its plans do not require it to provide to nonunion employees, violates the MOA's directive that the medical benefits provided to union members "will be the same" as those in effect for salaried workers. Accordingly, Hershey contends that the award cannot "in any rational way be derived from the agreement[.]" *United Transp. Union Local 1589 v. Suburban Transit Corp.*, 51 F.3d 376, 380 (3d Cir. 1995) (quoting *Tanoma Mining Co. v. Local Union No. 1269*, 896 F.2d 745, 748 (3d Cir. 1990) (emphasis omitted).

By way of response, the Union emphasizes that it is Hershey – not the arbitrator – that has created an inconsistency by electing not to reimburse tobacco-free salaried workers. Put another way, the Union asserts that "Hershey cannot simply justify its breach of Attachment I's terms by relying on what it does with non-union employees who do not have the benefit of a negotiated collective bargaining agreement[.]" (Doc. 47, at 13).

In a proceeding to vacate an arbitration award, this Court's review is "exceedingly narrow," and we must affirm where the award has some support in the record and does not manifestly disregard the law. *Eichleay Corp. v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 944 F.2d 1047, 1056 (3d Cir. 1991) (citation and footnote omitted). More particularly, an arbitration award must

stand if it "draws its essence from the collective bargaining agreement," *Akers Nat'l Roll Co. v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Service Workers Int'l Union*, 712 F.3d 155, 160 (3d Cir. 2013) (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36 (1987)) (internal quotation marks omitted), that is, "if the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention." *Id.* (quoting *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1128 (3d Cir. 1969)). Mindful that the parties have bargained for an arbitrator's assessment, the arbitration award should stand, and a court should not vacate an award based on a differing perception. *See Roberts & Schaefer Co. v. Local 1846, United Mine Workers of Am.*, 812 F.2d 883, 885 (3d Cir. 1987). *See generally United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596 (1960) ("The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards."). Thus, we have upheld arbitration awards even where they appeared "dubious," and the court would have reached a different result. *Roberts & Schaefer Co.*, 812 F.2d at 885 (internal quotation marks omitted).

Bearing this extremely high threshold in mind and attentive to our mandate to exercise judicial restraint, we cannot conclude that the arbitrator's award evidences "a manifest disregard of the agreement, totally unsupported by principles of contract construction" so as to warrant *vacatur*. *Ludwig*, 405 F.2d at 1128. The award reflects the arbitrator's determination that, as memorialized in Attachment I, the Company's anti-tobacco initiative was promoted and understood as an incentive and not a penalty-based program. As evidence of the parties' intent, the award cites materials circulated by Hershey, announcing that tobacco-free employees would be rewarded by receiving a discount on monthly premiums. Because tobacco-free employees were required to pay the full premium rate, the arbitrator concluded that the Company failed to provide the contemplated reduction to tobacco-free union members.

As to Hershey's argument that implementing the arbitrator's decision would violate the MOA by providing benefits to union members that are not "the same as" those provided to salaried employees, we agree with the Union that it is Hershey's treatment of salaried employees that would create disparity. Indeed, the arbitrator's ruling does not prohibit Hershey from providing a pro-rated, $300 reimbursement to every tobacco-free employee – both union and nonunion – a course that would resolve the inconsistency that Hershey now attempts to use as a

basis for *vacatur*. Thus, it appears that it was Hershey's method of implementing the award, and not the award itself, which could be conceived to violate the MOA.

We also note Hershey's position that the arbitrator's decision was based on representations made by the Company, extrinsic to the MOA, and not on an interpretation of Attachment I. However, the opinion and award, in referencing the parties' bargaining history and the materials distributed by Hershey to the Union, evidence that the arbitrator viewed the MOA "in light of its language, its context, and . . . other indicia of the parties' intention." *Akers Nat'l Roll Co.*, 712 F.3d at 160 (quoting *Ludwig*, 405 F.2d at 1128). Significantly, the Company does not argue that the term "tobacco-free differential" compels a penalty to tobacco users or proscribes a discount to non-users; even if Hershey had adopted such position, after bargaining for the decision of the arbitrator, the Company cannot avoid his decision merely because it disagrees with the result. *See*, *e.g.*, *Kane Gas Light & Heating Co. v. Int'l Bhd. of Firemen & Oilers*, 687 F.2d 673, 679 (3d Cir. 1982).

Given our analysis, and viewing the facts in the light most favorable to Hershey, we grant judgment on the pleadings in the Union's favor and deny Hershey's cross motion.

**B.     Arbitrability**

Turning to Count II of the Amended Complaint, pursuant to which Hershey

seeks a declaratory judgment that certain of the Union's grievances are nonarbitrable, as noted, the Union advances a motion for judgment on the pleadings while Hershey argues that it is entitled to summary judgment. We address the former motion first.

### 1. Union's Motion for Judgment on the Pleadings

In support of its motion, the Union maintains that the final clause of Attachment I does not remove the Attachment I Grievances from the purview of the general arbitration clause. It states that the Court should presume arbitrability based on the breadth of the CBA's arbitration provision, *see Battaglia v. McKendry*, 233 F.3d 720, 725 (3d Cir. 2000), and asserts that the final clause of Attachment I does not overcome the presumption, as it does not explicitly exclude the grievances from arbitration. *See Lukens Steel Co. v. United Steelworkers of Am.*, 989 F.2d 668, 673 (3d Cir. 1993) (citation omitted). In support, the Union highlights that the Attachment I language is inclusive, permitting that "any disputed amendments or changes that fall outside this Benefits Collaboration agreement *will be subject* to the grievance process." (Doc. 18-1, Ex. B) (emphasis added). By way of contrast, the Union notes that Paragraph 5 of the MOA expressly prohibits the "assert[ion] of any claim, in any form . . . challenging the Company's decision to close [the East Hershey plant]," underscoring that the

parties knew how to exclude certain claims when they wanted to. (Doc. 18-1, Ex. B); *see Eichleay Corp.*, 944 F.2d at 1058 ("The [agreements] do in fact expressly exclude some issues from arbitration. . . . This indicates that the parties knew how to remove issues from arbitration when they wanted to."). As no other evidence indicates the parties' intent to exclude the Attachment I Grievances from arbitration, the Union maintains that they are arbitrable.

Additionally, applying the Attachment I language, the Union contends that the relevant grievances allege changes to health benefits which violate – *i.e.*, "fall outside" of – the Benefits Collaboration agreement, bringing the claims within the CBA's grievance procedures. The Union explains that the Attachment I Grievances each allege that Hershey has violated the terms of Attachment I, requiring a determination of the meaning and application of the agreement's provisions. For instance, the Union notes that the 2012 and 2013 Healthcare Grievances aver that Hershey breached Attachment I's cost containment limits, trending and premium calculation requirements, and retiree premium limitations. It also attributes that the Wellness Program Grievance challenges the Company's interpretation of "former hourly employee" as contained in Attachment I, which grievance, significantly, was sustained by an arbitrator. (Doc. 30-3, Ex. 3); *see supra* note 3. In addition, the Union notes that the 2012 and 2013 Tobacco-free

Grievances, among other things, dispute the meaning of "tobacco-free differential."

"A determination of whether an employer has lived up to the commitments it has made as embodied in a negotiated agreement," the Union asserts, "[is] precisely the type of dispute best and appropriately suited for determination by an arbitrator." (Doc. 37, p. 21).

Finally, to conclude that the Attachment I Grievances are not arbitrable, the Union asserts, would remove from arbitration any claims that company action violated the terms and conditions of Attachment I, rendering meaningless the rights for which the Union bargained. The Union clarifies that it is not disputing Hershey's authority to design and change benefits plans but, rather, seeking to enforce the limitations upon the Company's discretion as memorialized in Attachment I.

Hershey, in opposition, argues that the CBA's general arbitration procedures are constrained by the terms of the MOA, interpreting that Attachment I subjects to grievance procedures *only* "disputed amendments or changes that fall outside this Benefits Collaboration agreement." (Doc. 18, Ex. B). The Company asserts that the Union's relevant grievances "fall within" the scope of Attachment I because they allege violations of express provisions of Attachment I and, thus, are necessarily excluded from the CBA's grievance process. Hershey notes, for

example, that the 2011 and 2012 Healthcare Grievances dispute the Company's implementation of the provisions contained in Attachment I (concerning, *e.g.*, cost-sharing, premium calculation, and trending) but that the Union does not contend that Hershey failed to apply the provisions entirely. As the design and implementation of benefits plans for all employees is within Hershey's prerogative, the Company argues, these matters are not subject to grievance procedures. Hershey further explains that "the Union acceded to Hershey's exclusive right to create plan design, make future changes to the benefits provided, determine the contributions paid by its employees, and, for Union employees, to apply the costing limitations set forth in Attachment I," and, in doing so, gave up its right to lodge relevant grievances. (Doc. 48, p. 28). To adopt the Union's position, Hershey asserts, would be to effectively abnegate the final clause of Attachment I.

Lastly, the Company generally notes that a purpose of Attachment I was to authorize Hershey to institute uniform benefits plans to its salaried and union employees in order to control its costs. Such purpose would be defeated, it maintains, if the Union were permitted to grieve benefits changes in order to modify union members' plans alone. The Company also notes that underlying its decision to expand facilities within the Union's jurisdiction was an understanding that it would be able to achieve cost savings through the benefits collaboration

program, stating that, otherwise, it could have relocated elsewhere.[4]

In determining whether a dispute is subject to grievance procedures, we generally presume arbitrability where an arbitration clause is drafted expansively. *See Battaglia*, 233 F.3d at 725; *cf. Local 827, Int'l Bhd. of Elec. Workers v. Verizon N.J., Inc.*, 458 F.3d 305, 310 (3d Cir. 2006) (stating that the presumption of arbitrability does not apply in all circumstances, namely where the arbitration clause is narrowly written). The presumption may be overcome if the CBA includes "an express provision excluding a particular grievance from arbitration," and, barring that, "only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *United Steelworkers of Am. v. Lukens Steel Co.*, 969 F.2d 1468, 1475 (3d Cir. 1992) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986)) (internal quotation marks omitted). Accordingly, the Third Circuit has delineated three questions to consider in determining arbitrability: "(1) Does the present dispute come within the scope of the arbitration clause?[;] (2) does any other provision of the contract expressly exclude this kind of dispute from arbitration?[;] and (3) is there any other 'forceful

_____

[4] Hershey's opposition brief additionally presents materials outside of the pleadings, relevantly: (1) the declaration of Steven R. Tilley; (2) the declaration of Debora Robare; and (3) the transcript of oral argument held before this Court on April 23, 2013. We will exclude these matters for purposes of considering the Union's motion. *See* FED. R. CIV. P. 12(d) (directing that a motion for judgment on the pleadings be treated as one for summary judgment where matters outside of the pleadings are presented and not excluded by the Court).

evidence' indicating that the parties intended such an exclusion?" *United Steelworkers of Am. v. Rohm & Haas Co.*, 522 F.3d 324, 332 (3d Cir. 2008) (quoting *E.M. Diagnostic Sys., Inc. v. Local 169, Int'l Bhd. of Teamsters*, 812 F.2d 91, 95 (3d Cir. 1987)) (internal quotation marks omitted).

Here, the CBA's general arbitration provision is drafted broadly to encompass any disputes arising between the Company and the Union or its members, and, as such, we apply a presumption of arbitrability.

As to whether the final clause of Attachment I constitutes an express provision excluding a particular grievance from arbitration, we note, significantly, that the clause is phrased inclusively and permissively. That is, the clause affirms that grievances that concern "disputed amendments or changes that fall outside this Benefits Collaboration agreement" are subject to the grievance process. To interpret the clause as an exception to the CBA's arbitration provision would require us to infer that changes that *do not* fall outside of the Benefits Collaboration Agreement are *not* subject to arbitration. That the subject language requires us to employ such inductive reasoning to construe it as exclusionary suggests that it does not preclude the Union's grievances from arbitration. Indeed, "[a]greements that require us to *assume* that an issue has been excluded from arbitration cannot be said to *expressly exclude* that issue." *Lukens Steel Co.,* 969

F.2d at 1476 (emphasis in original and footnote omitted). As the parties point to no other relevant exception to the CBA's arbitration clause, we cannot say that the MOA expressly excludes the Union's grievances from arbitration.

Lastly, we turn to whether Hershey has proffered forceful evidence of the parties' intent to exclude the Attachment I Grievances from arbitration. At most, Hershey has shown that the parties agreed that the Company had the authority to implement benefits plans that were the same for both union and nonunion employees. However, we are directed to no evidence leading us to conclude that, where those changes violate the terms of Attachment I, the parties understood the Union to have relinquished its rights to enforce the agreement. Importantly, it is not for this Court to consider the merits of the grievances, but only whether the parties have agreed that an arbitrator may do so. *See Rohm & Haas*, 522 F.3d at 331 (citing *Lukens Steel Co.*, 989 F.2d at 672). Also, as a practical matter, to find in Hershey's favor would leave the Union no recourse to enforce the MOA.

Accordingly, as no exclusionary term or forceful evidence persuades us otherwise, we find that the Attachment I grievances are arbitrable and the Union is entitled to judgment in its favor. In the interest of thoroughness, however, we address Hershey's summary judgment motion.

## 2.    Hershey's Motion for Summary Judgment

In support of its motion for summary judgment, Hershey additionally outlines the bargaining process preceding the execution of the MOA. The closure of the East Hershey plant was part of the Company's comprehensive program aimed at improving performance and reducing operating costs. (Doc. 44, ¶ 3-4). In considering relocating some of its operations to the West Hershey plant, the Company undertook negotiations with the Union, which represented employees at both locations. (*Id.* ¶ 5-6). Discussions began in March of 2010, at which point Hershey explained to the Union's Business Manager, Dennis Bomberger, that for the West Hershey plant to be a competitive option for development, the parties would need to eliminate an $8 million disadvantage from wages and benefits presently offered to the Union, and Hershey would require flexible operating principles and work rules. (*Id.* ¶¶ 9, 11). Hershey specifically communicated to Bomberger that it wished to implement benefits harmonization, such that all benefits plans would be the same for all domestic workers – union and non-union. (*Id.* ¶ 14). During the course of negotiations, Fred Boltz, the Union president, was also briefed by Hershey on these matters. (*Id.* ¶ 17).

On April 21, 2010, the Company presented a proposal for benefits harmonization, later labeled "Benefits Collaboration," posing that the benefits plan would feature one pool of participants and that Hershey would have exclusive

24

authority to create plan design and make future plan changes. (*Id.* ¶¶ 19-20). At that time, the Union did not object to Hershey's exclusive authority to implement plan changes or raise the right to grieve those changes, but did advance a concern regarding cost controls. (*Id.* ¶¶ 21-23). Hershey presented a new proposal on April 23, 2010, among other things, retaining its exclusive right – with minor limitation – to create benefits plans and implement changes, and restricting cost impact for Union members. (*Id.* ¶ 24).

On April 26, 2010, Boltz first questioned whether the Union could grieve plan design or changes, and Steven R. Tilley, the Company's Human Resources Director, explained that the Union would have no such right. (*Id.* ¶¶ 26-27). Thereafter, on April 30, 2010, Bomberger agreed that Hershey would have exclusive control to determine plan design and future changes, so long as cost limitations were included. (*Id.* ¶ 31). The company acquiesced, incorporating certain costing methodologies (*i.e.*, the Murphy formula). (*Id.*).

As to the grievance issue, Bomberger suggested that the Union be permitted to grieve issues "beyond the scope" of the Benefits Collaboration agreement, and Hershey advised Bomberger and Boltz that it would agree with the proposal. (*Id.* ¶¶ 32-33). Hershey added the relevant language to Attachment I, pertinently stating that "any disputed amendments or changes that fall outside this Benefits

Collaboration agreement will be subject to the grievance process," and the parties entered the MOA on May 28, 2010. (*Id.* ¶ ¶ 38-39).

Hershey additionally maintains that, at oral argument before this Court, the Union conceded that the final clause of Attachment I operates to restrict the CBA's arbitration provision. (Doc. 44-2, Ex. D., p. 13). Such concession, the Company argues, should be considered a judicial admission that the arbitration clause does not apply to the Union's grievances. Also, the Company contends that all benefits plan changes applicable to the Union satisfied the cost restrictions set forth in Attachment I, (Doc. 44, ¶ 68), such that the Union's only dispute concerned Hershey's discretion to implement benefits plan changes.

Even considering this proffer, we find that Hershey has failed to adduce the requisite forceful evidence to overcome the presumption of arbitrability. Also, to the extent Hershey attempts to reach the merits of the underlying grievances, in stating that the Company complied with Attachment I's cost restrictions, we decline to, as our role is constrained to determining whether a particular dispute may be submitted to arbitration. *See Rohm & Haas*, 522 F.3d at 331 (citing *Lukens Steel Co.*, 989 F.2d at 672).

## V.     CONCLUSION

For the reasons articulated herein, the Union's motion for judgment on the

pleadings shall be granted in full, and Hershey's motions for judgment on the pleadings and summary judgment shall be denied. An appropriate order shall issue.